No.  92-304

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

IN THE MATTER OF E.B.G.,
a Youth,

          Defendant and Appellant.

APPEAL FROM:    District Court of the Sixteenth Judicial District,
                In and for the County of Rosebud,
                The Honorable Joe E. Hegel, Judge presiding.

COUNSEL OF RECORD:

          For Appellant:

                Mark S. Werner, Attorney at Law,
                Billings, Montana

          For Respondent:

                Hon. Marc Racicot, Attorney General;
                Micheal S. Wellenstein, Assistant Attorney
                General, Helena, Montana; John S. Forsythe,
                Rosebud County Attorney, Forsyth, Montana

Submitted on Briefs:  October 29, 1992

Decided:  April 29, 1993

Filed:
FILED
APR 2 9 1993
Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

Clerk

Justice R. C. McDonough delivered the Opinion of the Court.

This is an appeal from the Sixteenth Judicial District Court, Rosebud County, of a conviction of a minor for possession of stolen property. We affirm.

The sole issue on appeal is whether there was sufficient evidence to support the conviction under § 45-6-301(3), MCA.

On September 27, 1991, the State filed a petition for a youth hearing alleging that the minor, E.B.G., was a delinquent youth because he violated § 45-6-301(3), MCA, by committing the offense of possession of stolen property. The petition alleged that he "knowingly obtained control over stolen property, No. 1 and No. 2 copper wire, of a value of more than $300 owned by Prince Inc., knowing the property to have been stolen by another and used, concealed or abandoned the property in such a manner as to deprive the owner of the property." The youth denied the charge and a trial was held. E.B.G. was found guilty by a jury and was later found to be a serious juvenile offender by the District Court judge. He was ordered committed to Pine Hills School and ordered to pay restitution in the amount of $7,047, the replacement cost of the wire.

Sometime between Monday, August 12, 1991, and Friday, August 16, 1991, David Quenzer (Quenzer) discovered that a large amount of wire was missing from his place of business, Prince Inc. Quenzer had seen the wire on Monday, August 12, but on Friday, August 16, he saw two empty pallets leaning against a boxcar used for storage of wire. He could see patterns of dust rings on the empty pallet

2

empty pallet where the wire had been. Quenzer called the police. He then started to call people in the recycling business and upon calling Border Steel, a recycling center in Glendive, Montana, Quenzer learned that they had received wire on the previous day that was similar to the wire which had been stolen.

The wire received at Border Steel on Thursday, August 15, 1991, was brought in by E.B.G. of ENT Recycling in Forsyth, Montana. Bret Smelser, part owner and manager of Border Steel, stated during trial that either E.B.G. or D.H., a youth assisting E.B.G., told him that the wire had been brought into ENT on Wednesday, August 14. E.B.G. told Smelser that he and his friend, D.H., burned the copper wire Wednesday night and early Thursday morning in South Dakota and then drove to Border Steel in Glendive.

Smelser bought most of the wire brought in by E.B.G., but did not accept some wire which was unburned and some clamps and connectors. E.B.G. told Smelser that he would clean those items and sell them to Border Steel at a later date, so they were placed back in the ENT truck.

Officer Skillen, a deputy sheriff with Rosebud County Sheriff's Department, investigated the case. He went to Border Steel where he interviewed Mr. Smelser and examined some wire from their storage area. Skillen examined No. 1 and No. 2 wire which were identified as wire brought in by E.B.G., as well as some connectors. The officer took several samples of wire and a Hubbel connector that had been brought in by E.B.G.

The investigating officer also examined the scene of the theft

3

and took photographs of the area. He found an area within the boxcar, where wire was stored, that contained multiple footprints. The footprints appeared fresh and there were "three relatively different types of prints." The officer stated that he was led to believe that the area was the same as it had been since the theft.

Officer Skillen also applied for a search warrant to search ENT, E.B.G.'s place of business. The search of ENT involved Officer Skillen, Sergeant McComb and Quenzer, and occurred on August 21. The search yielded some wire, which Quenzer stated looked like wire taken from Prince Inc., some brass clamps and some connectors. Smelser had previously told Officer Skillen about the wire, connectors and clamps which had been rejected by Smelser and returned to E.B.G. This information formed the basis of the search. Officer Skillen took several samples of the wire as well as two couplers during the course of his search.

Officer Skillen also learned that the wire "had been brought in by Justin Smith within a relatively short period of time." The officer asked for a receipt for the wire purchased by ENT from Smith and he was led to believe that the receipt should not be hard to locate because Smith had recently brought the wire into ENT. E.B.G.'s father, the manager of ENT, was going to locate the receipt and bring it to Skillen but it was never brought to him.

As another step in Officer Skillen's investigation of the stolen wire, he took statements from E.B.G. and E.B.G.'s father on August 23, 1991. E.B.G. stated that he understood that Justin Smith brought in a lot of wire and he had borrowed E.B.G.'s

4

father's truck to haul the wire. E.B.G also stated that his dad told him that Justin received the wire from Justin's dad. When asked what time E.B.G. left from Forsyth to Glendive, he stated that it was around 12:30 or 1:00 and he drove right to Glendive. When pressed by the detective as to where the wire came from, E.B.G. stated that:

> Well, we got, like I said, that one pile Justin Smith brought in quite a bit back there, but I was in school and I just, I never seen what the weight was and stuff. And he worked out -- he worked for us for awhile so -- and we had him cutting tanks out there and stuff and that's the time that he took it.

The officer asked: "At Princes's?" and E.B.G. stated that they were cutting iron out there. Then the officer asked if E.B.G. knew that Justin took it from Prince's and E.B.G. replied that "He said his dad gave it to him. I'm not familiar where his dad lives or anything." Officer Skillen asked whether the wire was in the same condition when Smith brought it in as when E.B.G. took it to Glendive or if he had to clean it. E.B.G. answered "Most of it, like the No. 1, we had some No. 1 that we had to clean up." Q. That you stripped; it wasn't burned?" "Yes", answered E.B.G.

When Mr. G., E.B.G.'s father, was interviewed, he stated that he and his wife kept the business records. He further stated that Justin Smith had brought in a large supply of wire but he did not specify to the officers when the wire was brought in. He explained that when he called Smelser (Border Steel) to negotiate on the price of the wire on August 15 and he told Smelser the wire had come in on the previous day, he meant that "it was loaded up onto my vehicle to be finished prepared." He said that although E.B.G.

5

owned the business, Mr. G. controlled the money and E.B.G. He also later reported that Justin Smith brought the wire in on November 20, 1990. He also related that E.B.G. cashed the check for the wire in Glendive, put some gas in the car and bought food for himself and D.H., who had assisted E.B.G. E.B.G. turned the remainder of the money over to Mr. G. upon his return to Forsyth.

Justin Smith testified that he had never brought in a large amount of copper wire but that he had helped Rob Watson bring in about 20 pounds at one time. He stated that he helped bring in that wire in November of 1990. He further related that he had borrowed Mr. G.'s pickup truck at one time but had never used it to pick up wire. Finally, he stated that he could not have delivered wire to ENT in July or August of 1991 because he was working from April 27 to August 23 or 24 of 1991 on the Colorado River in Arizona.

Our standard of review is "[w]hether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Brown (1989), 239 Mont. 453, 456-57, 781 P.2d 281, 284. (Citation omitted.)

Section 45-6-301(3), MCA, the statute at issue, reads:

> (3) A person commits the offense of theft when he purposely or knowingly obtains control over stolen property knowing the property to have been stolen by another and:
> (a) has the purpose of depriving the owner of the property;
> (b) purposely or knowingly uses, conceals, or abandons the property in such manner as to deprive the owner of the property; or
> (c) uses, conceals, or abandons the property knowing

6

such use, concealment, or abandonment probably will deprive the owner of the property.

E.B.G. argues that there was no proof that the wire had been stolen by another and there was no proof that the youth knew that the wire was stolen at the time he received the property. Each of these arguments will be taken in turn.

First, the State has provided sufficient evidence for a jury to conclude that E.B.G. knew that the wire was stolen. E.B.G. contends that "[t]here is absolutely no evidence in the record to show that at any period between August 12 and August 15, when the youth would have had physical possession of the wire, that he knew that it was stolen." The State counters that he would not have burned the insulated copper wire and sold it as scrap unless it was stolen. According to Dave Quenzer, the wire, if insulated, would be worth three to six dollars per foot and he estimated that the wire which was stolen was worth $5000 to $6000. Bret Smelser stated that he bought most of the wire that E.B.G. brought him but did not accept some of the wire because it was not completely burned. E.B.G. told Smelser that he would clean the unburned copper later and sell it to Smelser. In total, Smelser purchased 784 pounds of No. 1 wire and 986 pounds of No. 2 wire for a total of $1,318.80. The burning of the insulated copper wire to sell for scrap at a much lower price is evidence that could lead a jury to determine that E.B.G. knew the wire was stolen and therefore tried to change its appearance.

Further, E.B.G.'s inconsistent statements may have damaged his credibility before the jury. Bret Smelser said that E.B.G. told

7

him that he and D.H. had burned the wire in South Dakota on Wednesday night and early Thursday morning and then they drove from South Dakota to Glendive. However, when E.B.G. was interviewed by Officer Skillen, he stated that he drove straight to Glendive after leaving Forsyth between 12:30 and 1:00. He did not mention burning the wire and told Officer Skillen that the wire had been stripped, not burned. E.B.G.'s companion, D.H. testified at trial that they took the wire to Buffalo, South Dakota, to burn on Thursday, August 15. They left at about seven or eight o'clock that morning and then drove to Glendive, Montana, to Border Steel after burning the wire.

E.B.G. also made contradictory statements about how ENT had acquired the copper wire. When Officer Skillen asked E.B.G. during the taped interview where the wire he sold to Border Steel had come from the following discussion took place:

Q. Okay. Well, I guess where we're at is this. Prince's had about 2000 pounds of wire stolen in August. They'be identified the connectors and they've identified the wire as being theirs.
A. Yes.
Q. Okay. You brought that wire to Glendive?
A. Yeah, I did.
Q. So the bottom line is where did you get the wire from?
A. We've had a lot of wire held up for a long time.
Q. You see what I'm saying, if that amount of wire was taken, No. 1 and No. 2, it was insulated?
A. Yes.
Q. Two thousand pounds approximately sometime the second week of August, maybe the first or second week of August it was noticed; so those connectors and stingers and leads were all on that wire when it was in Glendive and it was identified, okay? So some of that wire, if not all, had to have come from Prince's.
A. Yes.
Q. So what I need from you is a logical explanation of

8

where you got the wire from?

A. Well, we got, like I said, that one pile Justin Smith brought in quite a bit back there, but I was in school and I just, I never seen what the weight wasand stuff. And he worked out -- he worked for us for a while so -- and we had him cutting tanks out there and stuff and that's the time that he took it.

Q. At Princes's?

A. Yeah, when we were cutting iron out there.

Q. Do you know that he took it from Prince's?

A. He said his dad gave it to him. I'm not familiar where his dad lives or anything.

"This Court has recognized that 'possession of stolen property, accompanied by other incriminating circumstances, and false or unreasonable explanation by the suspect is sufficient to sustain a conviction...'" State v. Ramstead (1990), 243 Mont. 162, 170, 793 P.2d 802, 807. (Citation omitted.)

Second, the State has provided sufficient evidence for a jury to conclude that the wire was stolen by another. E.B.G., himself, stated during his taped interview with Officer Skillen, that Justin Smith had taken the wire when he was working for ENT cutting up scrap iron at Prince, the scene of the theft.

"The weight of the evidence and credibility of the witnesses is exclusively the province of the trier of fact. If the evidence conflicts, it is within the province of the trier of fact to determine which shall prevail." Brown, 781 P.2d at 284. (Citation omitted.) In the instant case, there was sufficient evidence for the jury to determine that the State proved all elements of § 45-6-301(3), MCA. Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

9

John Conway Harrison

_____

_____

Justices

Justice Terry N. Trieweiler dissenting.

I dissent from the majority opinion. I would reverse the judgment of the District Court for the reason that there was insufficient evidence to support a conviction under § 45-6-301(3), MCA.

Under the above statute, the youth in this case was charged with theft for obtaining control over stolen property knowing the property to have been stolen <u>by another</u>. However, there was no evidence that the copper wire which the youth was accused of having illegally received was stolen by another. According to our prior case law, the absence of that proof was fatal to the State's case.

In *State v. Hernandez* (1984), 213 Mont. 221, 224, 689 P.2d 1261, 1262, we held that to sustain a conviction under the statute with which this youth was charged "requires proof that the property must have been stolen by someone *other than* the receiver."

Here there was no evidence of who stole the copper wire. In fact, during his closing argument the prosecutor argued that:

> [I]f he [E.B.G.] stole the wire he is guilty of theft. And another does not mean that if he stole the wire he is not guilty of this offense, that there was anyone else involved in it[,] he is just as guilty of this offense.

However, that argument was incorrect as a matter of law. If the youth in this case actually participated in the theft of the wire, then he was, in effect, convicted of receiving the wire from himself. In *Hernandez*, we ruled out that scenario when we held that:

> Here the charge essentially was that defendant received stolen property from himself. Defendant was charged with

11

". . . purposely or knowingly obtaining control over stolen property . . . knowing the property to have been stolen *by Matt Hernandez* . . . [the defendant here]." In *People v. Berg* (1968), 91 Ill. App. 2d 166, 234 N.E.2d 400, the Illinois court set forth the elements to prove receipt of stolen property, one of them being a requirement that the property was stolen by a person other than the one charged with receiving the property. Applied here, the defendant could not be convicted of stealing the coins, and later be convicted of receiving those coins from himself.

*Hernandez*, 689 P.2d at 1262-63.

The State argues on appeal that this case is distinguishable from *Hernandez* since in that case there was actual proof that the defendant had stolen the coins, and in this case, the State offered no proof that E.B.G. participated in the actual theft of the copper wire. However, the fact that the State did not attempt to disprove its case did not relieve it of the obligation to offer proof on each element of the crime with which E.B.G. was charged. To sustain a conviction, the State has the burden of proving that every element of the crime occurred beyond a reasonable doubt. In this case, one such element is that the property was received by the youth from another.

The State also argues that based on the number of footprints found at the scene of the crime, and the weight and length of the wire that was stolen, there was evidence that more than one person participated in the theft of the wire. However, the mere fact that several people participated in the theft of the wire does nothing to suggest that E.B.G. was not among those several people. If he was, he was just as guilty of theft under § 45-6-301(1), MCA, as

12

the others who participated, and according to *Hernandez*, could not be subject to criminal conviction for stealing the wire and later be convicted of receiving the wire from himself.

Finally, the State argues, and the majority seems to accept, that since E.B.G. stated in a tape recorded interview with the investigating officer that he had in fact received the wire from Justin Smith, that statement was sufficient to prove that he received the wire from another. However, both the State and the majority are selective about the weight they chose to give to E.B.G.'s statement about Smith.

When discussing the credibility of that statement for other purposes, the State referred to it as an "incredible explanation of how E.B.G. acquired the wire." In its brief, the State pointed out that:

> E.B.G. told Skillen that ENT had accumulated some of the wire and Justin Smith had brought in "quite a bit" of the wire. E.B.G. then explained that Smith stole the wire from Prince when Smith was cutting steel for ENT at Prince's. Tony, after giving various accounts prior to trial of when Smith had brought the wire to ENT, testified that Smith brought the copper wire to ENT on November 20, 1990. The time frame of the theft and Smith's employment with ENT made it impossible for him to have stolen the insulated copper wire from Prince's when cutting up steel there for ENT. Smith had worked for ENT for two months in the fall of 1990. In October 1990, while working for ENT, Smith cut up steel at Prince, Inc. The theft of the insulated copper wire occurred sometime between August 12 and August 16, 1991. Accordingly, it was impossible for Smith to steal the wire from Prince while he was salvaging steel there for ENT, because the theft had not yet occurred, and would not occur for approximately a year. Also, Smith could not have stolen the wire in August 1991 because he was working in Arizona at that time. Furthermore, Smith denied that he had brought in a large amount of wire to ENT. The jury, as

13

trier of fact, clearly did not believe E.B.G.'s incredible and impossible explanation of how ENT acquired the copper wire.

Brief of Respondent, pp. 11-12.

Likewise, the majority opinion points out that the wire was stolen sometime between August 12, 1991, and August 16, 1991. The majority refers to E.B.G.'s statement that he received this wire from Smith in November 1990 as an example of why he had poor credibility before the jury, and then turns around later in the same opinion and uses that same statement as the only basis for supporting the jury's finding that the wire was in fact received from another.

The fact is that the wire could not have been stolen by Smith because it was not taken during the time that Smith was working on Prince's property, and Smith was out of state at the time that the wire was taken.

There was absolutely no evidence that the wire stolen from Prince, Inc., was stolen by anyone other than E.B.G. E.B.G. cannot be convicted under § 45-6-301(3), MCA, of receiving stolen property that he himself stole. Since there was not substantial evidence for each element of the crime with which the youth was charged, I would reverse his conviction and dismiss the complaint against him.

_____
                    Justice

Justice Karla M. Gray concurs in the foregoing dissent.

_____
                    Justice

Justice William E. Hunt, Sr. joins in the foregoing dissent.

_____
                    Justice